**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:25-cv-25413-MORENO/D'ANGELO**

RUNBUK, INC.,

        Plaintiff,

    v.

ICE CAP ADVENTURES LTD. and
DAVID KELLY,

        Defendants.

_____/

**PLAINTIFF RUNBUK, INC.'S MOTION FOR PRELIMINARY INJUNCTION**
**AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Plaintiff Runbuk, Inc., by its undersigned counsel and pursuant to 15 U.S.C. § 1116 and

Fed. R. Civ. P. 65, hereby moves for a preliminary injunction against Defendants David Kelly

and Ice Cap Adventures Limited, and in support thereof states as follows:

**INTRODUCTION**

Runbuk owns and operates the World Marathon Challenge®, an extreme event where

participants run marathons on all seven continents over the course of a single week. The former

race doctor for the World Marathon Challenge®, David Kelly, has now organized a competing

race. To attract extreme marathoners to his new event, Kelly and his company (Ice Cap

Adventures) are willfully infringing Runbuk's trademarks with an intent to create confusion

among and divert Runbuk's consumers into running Defendants' event—thus causing Runbuk

irreparable harm. The seventh and final leg of Kelly's competing race will take place on

November 21 in Miami. To forestall a flood of confusing social media posts and false advertising

at the conclusion of this competing race, Runbuk now seeks a preliminary injunction barring the

use of Runbuk's registered and common law trademarks in connection with Kelly's race.

## STATEMENT OF FACTS

### A.  RUNBUK'S WORLD MARATHON CHALLENGE®

Runbuk organizes and operates marathons and other running competitions in unique locations, including at the North Pole, on Easter Island, and in Antarctica. One of Runbuk's flagship competitions is its World Marathon Challenge® (the "**WMC**"). The WMC is an annual event, founded in 2015, in which long-distance runners take on the amazing logistical and physical challenge of running 7 marathons on 7 continents in 7 days, also known within the industry of long-distance runners and fans of extreme sports as running "777" or the "777 Challenge." The WMC is famous amongst extreme long-distance runners for its unprecedented and unique approach to global marathon running. Professional and hobby runners from around the globe participate in the WMC and it is famous as the first event to organize and host consecutive marathons on every continent in a single week. Hu Dec. ¶ 2.

The 777 Challenge starts in Novo (Antarctica) and is followed by marathons on consecutive days in Cape Town (Africa), Perth (Australia), Dubai (Asia), Madrid (Europe), Fortaleza (South America) and Miami (North America), all conducted within 168 hours from start to finish. As of February 2025, there are only 244 people who have completed the 777 Challenge. *Id*. ¶ 3.

WMC was originally organized and directed by Richard Donovan. Donovan applied for some of the trademarks used in connection with the organization and servicing of the WMC between 2016 and 2019, each of which have matured to registration. These include but are not limited to 7 MARATHONS 7 CONTINENTS 7 DAYS (U.S. Reg. No. 7476660); 7 MARATHONS 7 CONTINENTS IN 7 CONSECUTIVE DAYS (U.S. Reg. No. 7435005); and 7

2

MARATHONS CLUB (U.S. Reg. No. 6583837) (collectively, the "**WMC Registrations**" or "**WMC Registered Marks**"). Hu Dec. ¶¶ 4-6, Exs. 1-3.

Starting in 2016, Mr. Donovan sold spots in the WMC to Runbuk, which would then resell those spots to connect additional participants to the WMC. *Id*. ¶ 7.   In December 2022, Runbuk and Donovan executed a sales agreement (the "**WMC Sales Agreement**") in which Donovan transferred to Runbuk 100% ownership of the WMC and all rights in the related trademark and domain names associated with the WMC, including the WMC Registrations. *Id*. ¶ 8, Ex. 4.

Pursuant to and after entering into the WMC Sales Agreement, Mr. Donovan informed all WMC vendors—including Defendant Kelly—that Runbuk now owned and would be operating the WMC going forward. *Id*.

On October 31, 2024, Runbuk filed a trademark application for the mark "777" (Serial No. 98830410) with a first use date of January 13, 2015, in connection with "[a]thletic and sports event services, namely, arranging, organizing, operating, and conducting marathon races; [c]onducting running races (the "**WMC Application**" or "**WMC Common Law Mark**," and collectively with the WMC Registered Marks, the "**WMC Marks**"). *Id*. ¶ 9, Ex. 5.

In accordance with the terms of the sale, Runbuk took over organization and direction of the WMC starting with the eighth edition of the marathon, which took place in 2025.

**B.  DEFENDANTS' WILLFUL INFRINGEMENT OF WMC MARKS**

Between 2017 and 2023, Defendant Kelly worked as a doctor and contractor for the WMC under Mr. Donovan. Hu Dec. ¶ 10.

According to corporate records filed in Ireland, Kelly founded Ice Cap Adventures, Ltd.'s predecessor, "Mckel Sports Ltd." on October 8, 2021. He filed a certificate of incorporation and

change of name on April 26, 2023 in Dublin, Ireland to rename Mckel Sports Limited to Ice Cap Adventures, Ltd. *Id.* ¶ 11, Ex. 6.

In 2023, Kelly began promoting a new, competing multi-continent marathon event called The Great World Race ("**TGWR**"). TGWR was founded on the same general concept as WMC, namely the organization and facilitation of an annual event in which participants would run one marathon on every continent within seven days. *Id.* ¶ 12.

To be sure, Kelly is free to create a competing race program—even one that follows the same basic pattern as the WMC.  But Kelly did not set out to compete with WMC fairly. Rather, he leveraged his time, experience and prior affiliation with the WMC organization to attract, divert, and confuse consumers in a narrow market—with an intent to interfere with Runbuk's acquisition and succession of the WMC business, step into Runbuk's shoes, and pass off Defendants' TGWR event as one organized and run by WMC.

Kelly set out to do this by advertising TGWR with the same marks long associated with the WMC, including but not limited to 7 MARATHONS 7 CONTINENTS 7 DAYS. Kelly knew that the relevant consuming public for his new, competing event had come to recognize and associate the WMC Marks with WMC, but Kelly also knew--as the race doctor for WMC from 2017 to 2023—that  consumers in this narrow market (*i.e.*, extreme running enthusiasts, many of whom had run the WMC before), had come to recognize and associate ***Kelly*** with the WMC, and might believe his new competing event *is* the WMC. Thus, Kelly sought to capitalize on that consumer recognition and mistaken belief, and he personally directed and oversaw a scheme whereby Defendants would intentionally use the WMC Marks to create confusion and divert WMC's consumers, misleading them by passing off TGWR as WMC's successor.

4

On September 26, 2024, Kelly even applied for the "777" trademark (Serial No. 98772734) in connection with "organizing, arranging, and conducting marathon, running, triathlon, duathlon, and athletic competition events" on an intent to use basis, which is identical to the 777 mark that WMC had been using (via its predecessor in interest) since 2015. Hu Dec. ¶ 13, Ex. 7.

Defendants also created a website and social media accounts for TGWR which boasts the mark 7 MARATHONS 7 CONTINENTS 1 WEEK, and variations thereof, throughout the webpages and in posts to their social media accounts. *Id*. ¶ 14, Ex. 8. Defendants have further been using 7 MARATHONS 7 CONTINENTS 1 WEEK on their physical banners and finish line decorations in the same exact way that Runbuk uses 7 MARATHONS 7 CONTINENTS 7 DAYS on its banners and decorations, furthering confusion. *Id.* ¶ 15, Ex. 9.

Defendants have perpetuated misuse and infringement of the WMC Registered Marks by reposting to TGWR's Instagram account (@thegreatworldrace) stories posted by participants who refer to TGWR as 7 MARATHONS 7 CONTINENTS 7 DAYS, which reposts by Defendants blatantly infringe the WMC Registered Marks.  *Id*. ¶ 16, Ex. 10.

## C.  INSTANCES OF ACTUAL CONFUSION

As of 2025, only 244 people have ever completed the WMC (Hu Dec. ¶ 3); in 2024, 44 people completed the TGWR (*id*.¶ 17, Ex. 11) and 50 are expected this year (*id*.¶ 17, Ex. 12). Despite this relatively small number of participants in these competing races, there have been many of instances of actual confusion wherein the marathon runners themselves, the charities for whom some of them are running, their thousands of supporters, fans of WMC, and media outlets have posted to social media or published articles and webpages with the inaccurate belief based on confusion that TGWR is affiliated with WMC.

For example, individuals have posted to social media stating that either they are running WMC when they are actually signed up for TGWR or that they are supporting someone running WMC who is actually running TGWR. Hu Dec. ¶¶ 18-19, Exs. 13-14.

Participants have also posted to social media calling TGWR the "777" race or challenge, when the right to the exclusive use of this mark belongs to WMC. *Id*. ¶ 20, Ex. 15. Defendants themselves have referred to TGWR as "777 Challenge" on their Instagram when they are fully aware "777" has been a source indicator for WMC for over a decade. *Id*. ¶ 21, Ex. 16.

And—as one would expect—news outlets have followed Kelly's lead, incorrectly using the WMC Registered Marks to refer to TGWR under the mistaken belief that the marks refer to TGWR. *Id*. ¶ 22, Ex. 17. Likewise, social media accounts have been using the WMC Registered Marks in their posts reporting on TGWR and its participants. *Id.* ¶ 23, Ex. 18.  Other websites have also included features of participants of TGWR on their website under the 7 MARATHONS 7 CONTINENTS 7 DAYS mark that belongs to Runbuk. *Id*. ¶ 24, Ex. 19.

Runbuk has attempted to ameliorate this rampant confusion by contacting the individuals who have uploaded such posts demonstrating confusion, including to influencers who have been misusing the WMC Registered Marks. But Runbuk has been met with silence, indifference, or additional confusion. Hu Dec. ¶ 28.  Runbuk needs and is entitled to an injunction to prevent further confusion, injury to its reputation, and loss of consumers and goodwill.

## **LEGAL ARGUMENT**

The Court should preliminarily enjoin Defendants from using the WMC Marks to in any way promote or reference TGWR. Runbuk has substantial evidence to establish the four pre-requisites for preliminary injunctive relief: *(1)* a substantial likelihood of success on the merits of the underlying case; *(2)* that irreparable injury will be suffered unless the injunction is issued; *(3)*

the threatened injury to the moving party outweighs any damage the proposed injunction might cause the non-moving party; and *(4)* an if issued, the injunction would not be adverse to the public interest. *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015); *La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1259 (S.D. Fla. 2024).[1]

### I. Runbuk is likely to succeed on the merits.

#### a. Runbuk will prevail on its trademark infringement claim against Defendants.

Runbuk is likely to succeed in its trademark infringement claim against Defendants. To prevail on a trademark infringement claim, a plaintiff must demonstrate that (1) they own valid and enforceable trademarks; (2) defendants have used the trademarks in commerce without plaintiff's consent; and (3) the unauthorized use was likely to deceive, cause confusion, or result in mistake. *La Potencia*, 733 F. Supp. 3d at 1259; *see also* 15 U.S.C. § 1114.

##### i. Runbuk owns valid and protectable trademarks.

Runbuk's WMC Marks are valid and protectable. To be valid and protectable, trademarks need to be distinctive; marks that are not inherently distinctive can acquire distinctiveness by obtaining secondary meaning. *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782-83 (11th Cir. 2020). Even if trademarks are on the Supplemental Register, where the marks have acquired secondary meaning, the marks are valid and protectable. *See La Potencia, LLC v. Chandler*, 733 F. Supp. 3d 1238, 1261 (S.D. Fla. 2024). Specifically, a "mark obtains a secondary meaning—and therefore acquires distinctiveness—when, in the minds of the relevant consuming public, the 'primary significance of the term ... is not the product but the producer'."

---

[1] The standard is the same under Florida law: (a) a substantial likelihood of success on the merits; (b) a likelihood of irreparable injury (c) the unavailability of an adequate remedy at law; and (d) consideration of the public's interest. *See e.g., City of Oviedo v. Alafaya Utilities, Inc.,* 704 So.2d 206, 207 (Fla. 5th DCA 1998).

*See id.* (citation omitted). Here, even those WMC Registrations that appear on the Supplemental Register have acquired distinctiveness.

In this Circuit, secondary meaning can be proven through direct or circumstantial evidence. *Id*. (citing *Royal Palm Props., LLC, LLC*, 950 F.3d at 784). For the latter, courts consider four factors in determining whether a mark has acquired secondary meaning: "(1) the length and manner of [the mark's] use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the [proprietor] to promote a conscious connection in the public's mind between the [mark] and the [proprietor's] product or business; and (4) the extent to which the public actually identifies the [mark] with the [proprietor's] product or venture. *Id*. at 1261-62. "Secondary meaning does not require proof that consumers know the name of the company that owns the trademark. It requires only that customers associate the word or symbol with a single, albeit anonymous, commercial source." *Id*. at 1261 (citing *TracFone Wireless, Inc. v. Anadisk, LLC*, 685 F. Supp. 2d 1304, 1311 (S.D. Fla. 2010).

Here, the length and manner of use of the WMC Marks weighs decidedly in Runbuk's favor. The World Marathon Challenge® has been using the WMC Marks in commerce in connection with the WMC since as early as 2015, amounting to ten (10) years of continuous use of the WMC Marks. *See* Hu Dec. ¶¶ 2, 4-6, Exs.1-3 (indicating first uses in commerce in 2015). This Court has ruled in favor of trademark owners on this factor where the length of use was only two years long, explaining that "the time necessary to acquire secondary meaning may be quite short." *La Potencia*, 733 F. Supp. 3d at 1262 (citation omitted). Runbuk's ten years of continuous and exclusive use weighs heavily in favor of the WMC Marks having acquired secondary meaning.

For advertising and promotion, "the question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of [the word] to the consuming public." *Id*. (citations omitted). Additionally, "[w]hen a product is 'targeted at only a specific segment of the general public,' the relevant consuming public consists only of those targeted consumers—not the public at large'." *Id*. at 1261 (citation omitted). For the World Marathon Challenge®, the consuming public is a narrow class of marathon and extreme race runners, including participants in the WMC, supporters of participants in the WMC, and fans of the WMC and extreme running. Since the WMC is the first of its kind and is uniquely intense in nature, WMC has been reported on and promoted extensively by third parties, which have used the WMC Marks to identify the WMC for years. This reporting and unsolicited news and media coverage includes, but is not limited to, nationwide news organizations such as ABC News, FOX News, CBS, and widely circulated online newspapers, like The San Diego Union Tribune. Hu Dec. ¶ 3, 35, Ex. 18. Oftentimes, this unsolicited media coverage reporting on Runbuk's WMC uses the mark "7 MARATHONS 7 CONTINENTS 7 DAYS" in the headline of their articles and identify WMC as the specific event later in the publication, even stating that this feat is "called the World Marathon Challenge." *Id*. ¶ 25, Ex. 20. Platforms specifically created to market to the running community have also (without solicitation) reported on and promoted the WMC using the WMC Marks, including but not limited to *Runner's World*. *Id*. ¶ 26, Ex. 21.   The nature and extent of this widespread unsolicited media coverage establishes that the WMC Marks have acquired secondary meaning.

Similarly, Runbuk also personally engages in substantial marketing and promotion of the WMC brand and WMC Marks by advertising all over its social media accounts, including on Instagram <@WorldMarathonChallenge777> and Facebook page <World Marathon Challenge>,

and through its website at <https://www.worldmarathonchallenge.com/>. Hu Dec. ¶ 7.  Runbuk further encourages participants to use its WMC Marks to raise funds for charitable causes, including but not limited to St. Judes Heros, Testicular Cancer Awareness Foundation, and Alzheimer's Foundation of America (AFA). *Id*.  This evidence supports the conclusion that Runbuk has expended considerable effort and resources to establish a connection between the WMC Marks and the WMC such that the relevant consuming public identifies the WMC Marks with WMC. *See Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 189-90 (11th Cir. 2005) (ruling mark entitled to trademark protection because it acquired secondary meaning, in part because of great effort the owners expended in establishing a connection between the "Barrow" name and the business—where the mark appeared throughout the company's office signs, trucks, customer invoices, and advertising materials).

Lastly, and perhaps most importantly, in addition to the circumstantial evidence set forth above, there is significant evidence of ***actual confusion***, which serves as direct evidence of secondary meaning. Hu Dec. ¶¶ 18-20, 22-24, Exs. 13-15, 17-19.  Where consumers are confused, it means that they must have recognized the plaintiff's mark and associated it only with plaintiff. *See La Potencia*, 733 F. Supp. 3d at 1263. Here, as discussed above (and also below, in connection with the likelihood of confusion factors—*see* Section I.A.iii.1), there has been rampant actual confusion. In particular, Runbuk has found documented instances where supporters and participants in TGWR have improperly used WMC Marks and even tagged the WMC social media accounts, confusing the race they are running (TGWR) for the WMC. Hu Dec. ¶¶ 18-20, Exs. 13-15. Furthermore, Runbuk has found internet articles reporting on TGWR but using the WMC Marks and mistakenly stating that the participants ran the "World Marathon Challenge." *Id*. ¶¶ 22-24, Exs. 17-19. Both of these kinds of actual confusion demonstrate that

WMC Marks have acquired secondary meaning such that the consuming public is mistakenly associating TGWR with WMC and the well-known WMC Marks.

### ii.   Defendants use the Infringing Marks in commerce without consent.

Likewise, the second element is easily shown here. Defendants have been using marks confusingly similar or identical to Runbuk's WMC Marks with nearly identical services, including 7 MARATHONS 7 CONTINENTS 1 WEEK; 7 MARATHONS 7 CONTINENTS ONE WEEK; and 777 (the "Infringing Marks"). Specific instances of this infringing use are as described above, including but not limited to publicizing TGWR using the Infringing Marks and reposting social media participants' posts that improperly make use of the Infringing Marks in furtherance of the confusion Defendants have intentionally sought to create. Hu Dec. ¶¶ 14-16, 21, Exs. 8-10, 16.

Defendants do not own registrations for any of the Infringing Marks, nor can use of any of the marks predate Runbuk's use given that TGWR began years after WMC's first use of each of the WMC Marks. Accordingly, Defendants have no reason to use any of the Infringing Marks other than to confuse and divert Runbuk's consumers to their competing event. Further, since TGWR began, Runbuk has communicated with Kelly and Ice Cap Adventures, Hu Dec. ¶ 27, and filed Oppositions at the TTAB objecting to Defendants' use of the Infringing Marks. *Id.* ¶ 13. As such, Defendants are on notice that their uses are unauthorized, and they are using the Infringing Marks in commerce without Runbuk's consent.

### iii.   Defendants' use of the Infringing Marks is likely to cause confusion.

The Eleventh Circuit weighs the following seven factors in assessing whether a likelihood of confusion exists: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and

services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1220 (11th Cir. 2008). "The district court "does not have to consider all of these factors in every case." *La Potencia*, 733 F. Supp. 3d at 1263 (citation omitted). Indeed, the Eleventh Circuit notes that, out of all these factors, the strength of the mark and actual confusion are the most probative. *Id*. (citing *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1165 (11th Cir. 2019)). Given that, and the substantial evidence of actual confusion here, Runbuk addresses this factor first.

### 1. Actual Confusion

While evidence of actual confusion is not necessary for the Court to find a likelihood of confusion, evidence of actual confusion is the best evidence that confusion is likely. *See e.g., Frehling Enterprises*, 192 F.3d at 1335 ("It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion."); *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022); *Fla. Int'l U. Bd. of Trustees v. Fla. Nat'l U., Inc.*, 830 F.3d 1242, 1264 (11th Cir. 2016). "[I]n assessing the quantum of actual confusion required for a finding in the plaintiff's favor, even a 'very little' amount of actual confusion is highly probative." *La Potencia, LLC*, 733 F. Supp. 3d at 1266.

Here, there is copious evidence of actual confusion. Hu Dec. ¶¶ 18-20, 22-24, Exs. 13-15, 17-19. Participants, supporters of participants, and fans of TGWR are constantly using the WMC Marks in connection with TGWR, even tagging WMC in posts made announcing participation in TGWR.  Hu Dec. ¶¶ 18-20, Exs. 13-15. Defendants do not correct these participants but rather encourage this confusion by using the WMC Marks on their website, posts to their Instagram and

other social media accounts, and by reposting onto their own social media account yet additional social media posts from participants, supporters, and fans that feature infringing and confused use of the WMC Marks. *Id*. ¶¶ 14-16, 21, Exs. 8-10, 16.

### 2. Strength of Runbuk's WMC Marks

To be enforceable, a trademark must be "distinctive"—a mark that identifies the source of the goods or services. *Id*. at 1261 (citing *Royal Palm Props., LLC*, 950 F.3d at 782). Marks that are not "inherently distinctive"—and hence descriptive—can "acquire" distinctiveness by obtaining "secondary meaning." *Id*. (citation omitted).

Where a product or service is targeted only at a specific segment of the general public, the relevant consuming public consists only of the targeted consumers, not the public at large. *La Potencia*, 733 F. Supp. 3d at 1261.  The WMC Marks are each either inherently distinctive within the extreme running community or have garnered secondary meaning through a decade of continuous and exclusive use in the long-distance running and extreme sports industry—either way, they are distinctive. *Id*. (citing *Royal Palm Props.*, 950 F.3d at 782-83) ("a mark obtains secondary meaning – and therefore acquires distinctiveness – when, in the minds of the relevant consuming public, the 'primary significance of the term is not the product but the producer'"). Again, the actual evidence of confusion set forth above further "constitute[s] direct evidence of secondary meaning." *La Potencia*, 733 F. Supp. 3d at 1263.

Here, the class of consumers is narrow, consisting of participants, supporters, and fans of long-distance running and extreme sports, specifically the sport of running cross-continent marathons, all of whom undoubtedly associate the trademarks 777; 7 MARATHONS 7 CONTINENTS 7 DAYS; and 7 MARATHONS 7 CONTINENTS IN 7 CONSECUTIVE DAYS with the WMC. As the first of its kind, World Marathon Challenge® has earned a certain renown

13

and recognition within this community. Due to the WMC's prominence in this industry, Runbuk has found that its customers have been able to associate the WMC Marks and "777 Challenge" with the WMC even when Defendants post these in connection with TGWR. For example, Defendants uploaded social media posts referring to TGWR as "777 Challenge" and using the WMC Registered Marks, and Instagram users commented on those posts associating the WMC Registered Marks and WMC Common Law Mark with WMC, demonstrating the secondary meaning that the WMC Marks have acquired as a source indicator of WMC. Hu Dec. ¶ 21, Ex. 16; *see La Potencia*, 733 F. Supp. 3d at 1263. Accordingly, the WMC Marks have acquired secondary meaning and are strong source indicators of WMC.

### 3. Similarity of the Infringing Marks to Runbuk's WMC Marks

The next prong of the likelihood-of-confusion analysis also favors Runbuk. In evaluating the similarity between the WMC Marks and the Infringing Marks, it is well established that courts examine the overall impression of the marks, including the sound, appearance, and manner in which they are used. *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1337 (11th Cir. 1999) (citing *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983)). The evaluation also includes the similarity in commercial impression between the marks. *La Potencia*, 733 F. Supp. 3d at 1264 (citing *In re Detroit Athletic Co.*, 903 F.3d 1297, 1303–04 (Fed. Cir. 2018) (affirming the TTAB's finding that the marks DETROIT ATHLETIC CO. and DETROIT ATHLETIC CLUB "are nearly identical in terms of sound, appearance and commercial impression," and finding that, "while it is true that the words 'Co.' and 'Club' technically differentiate the marks, those words do little to alleviate the confusion that is likely to ensue").

Here, Defendants' use of the Infringing Marks is nearly identical to Runbuk's use of the WMC Marks in sound, appearance, and commercial impression, and therefore weighs sharply in favor of confusing similarity. Specifically, Defendants use "7 marathons 7 continents 1 week" (which is strikingly similar to 7 MARATHONS 7 CONTINENTS 7 DAYS in appearance and commercial impression) throughout the website for TGWR, on its Facebook and Instagram posts, and on physical signage at TGWR events. Hu Dec. ¶¶ 14-16. Exs. 8-10. Not only does the infringing mark encompass the majority of Runbuk's mark, it has an identical meaning to and instills the same commercial impression as Runbuk's registered mark. Defendants also use "777" and "777 Challenge" to promote its events, which is identical to Runbuk's WMC Common Law Mark for 777. *Id.* ¶ 21, Ex. 16. Courts in the Eleventh Circuit and this District have found confusing similarity where the similarity between marks was equally or less apparent than in the instant case. *See e.g, Frehling Enters.,* 192 F.3d at 1337 (finding striking similarity between BELL'OGGETTI and OGGETTI); *La Potencia*, 733 F. Supp. 3d at 1264 (finding "Authentic by David Chandler" similar to CHANDLER BATS); *Cross Country Home Servs., Inc. v. Home Serv. USA Corp.*, No. 08-64156-CIV, 2010 WL 331752, at *6 (S.D. Fla. Jan. 20, 2010) (finding similarity between plaintiff's "HomeServe 24" mark and defendant's "Home Service USA A Member of Homeserve plc."). Thus, the marks are clearly similar.

### 4. Similarity of the Services, Sales Methods, and Advertising Methods

All three of these related factors weigh heavily in Runbuk's favor. Runbuk and Defendants are offering, selling, and advertising the same exact services—namely, the organization and operation of marathons, including an annual event for seven consecutive marathons held in the span of one week across all of the world's continents, in connection with

15

the WMC Marks—using the same or substantially similar names to an overlapping niche clientele.

Because of the highly specialized and extremely difficult nature of the event, Defendants' TGWR is in direct competition with Runbuk's WMC and their consumer bases are essentially identical (namely, people with the talent, interest, and finances to take part in such an event). Defendants have even poached marathon participants from Runbuk. Hu Dec. ¶ 17. Additionally, Defendants use the same advertising methods as Runbuk: web pages, social media, physical signage, and specialty media outreach. *Compare* Hu Dec. ¶¶ 3, 7, 25-26 (Runbuk's channels of trade) *with* ¶¶ 14-16, 21 (defendants' channels of trade). This tips the scale decidedly towards Runbuk. *La Potencia*, 733 F. Supp. 3d at 1265 (citing *Turner Greenberg Assocs. v. C & C Imports, Inc.*, 320 F. Supp. 2d 1317, 1332 (S.D. Fla. 2004) ("If a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable")). Both parties market and promote their extreme marathons over the internet to consumers, and Defendants have gone so far as to use Kelly's knowledge of and connections to WMC's participants from his time working for WMC to directly promote his competing event to actual and prospective WMC runners to convince them to run TGWR instead. Hu Dec. ¶ 17.

### 5. Defendants' Intent

Under this factor, courts determine whether an infringer "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent." *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1331 (S.D. Fla. 2015). "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling Enters., Inc.*, 192

F.3d at 1340 (holding defendants' failure to conduct trademark search and continued use after refusal of USPTO to register contested mark sufficient for finding of intentional blindness and improper intent).

Here, there is no doubt that Defendants knew about the WMC and its associated marks—Kelly was the race doctor for WMC races for years.  So he did not stumble into these competing and confusingly similar brands.  The Court can infer from his knowledge and deliberate targeting of WMC runners that the Defendants intentionally sought to capitalize on the goodwill Runbuk has built around its WMC. Defendants even encouraged confusion by reposting stories on Instagram that contained the Infringing Marks and/or improper uses of the WMC Marks from participants, supporters, and fans to refer to TGWR. Hu Dec. ¶ 16, Ex. 10.

In sum, each of the seven likelihood of confusion factors weigh in Runbuk's favor. Runbuk has therefore shown a likelihood of success on the merits of its trademark infringement claim and is entitled to preliminary injunctive relief.

## II.     If Defendants are not enjoined, their conduct will irreparably harm Runbuk.

To obtain injunctive relief, Runbuk must establish that it will suffer irreparable harm if an injunction were denied. *La Potencia*, 733 F. Supp. 3d at 1274. "[A] sufficiently strong showing of likelihood of confusion caused by trademark infringement may by itself constitute a showing of a substantial threat of irreparable harm." *Id*. (finding irreparable injury) (*citing Boulan South Beach Master Ass'n., Inc. v. Think Properties, LLC*, 617 F. App'x 931, 934 (11th Cir. 2015); *TracFone Wireless, Inc. v. Clear Choice Connections, Inc*., 102 F. Supp. 3d 1321, 1333 (S.D. Fla. 2015) (finding irreparable injury); *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1363 (S.D. Fla. 1998) (finding irreparable injury). Because Runbuk has established a substantial likelihood of success on the merits, irreparable harm is presumed.

But even absent the presumption established through the finding of likelihood of success on the merits, Runbuk has been and continues to be irreparably harmed by Defendants' unlawful conduct. "In no uncertain terms, the Eleventh Circuit has provided, the loss of customers and goodwill is an irreparable injury." *La Potencia*, 733 F. Supp. 3d at 1274 (citing *Jysk Bed'N Linen*, 810 F.3d at 780 (quotations omitted)). Irreparable injury has also been supported where defendants make no indication that they will cease using the infringing marks. *Id.,* 733 F. Supp. 3d at 1274. Here, as discussed, Defendants not only use the WMC Marks themselves in online marketing materials and on physical signage and structures, but they also actively encourage consumers to use the Infringing Marks in connection with TGWR.

It is true that TGWR started in 2023. But—again—there is nothing unlawful about running a competing race.  What *is* unlawful—and causes irreparable harm—is incrementally changing branding, year over year (beginning from TGWR's *original* brand "Around the World in 7 Days"), to get ever closer to the WMC's brands until their shared niche consumers cannot even tell which is which.  That is the story the evidence tells—and why an injunction must issue now even though this is not Defendants' first race.

### III.     The balance of the hardships tips sharply toward Runbuk.

In a trademark infringement case, "the probable loss of consumer goodwill for [the plaintiff] outweighs the cost of delay that [the defendant] will incur in not being able to sell [the infringing products] until a decision on the merits." *Davidoff & CIE, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1304 (11th Cir. 2001).

Runbuk has expended substantial time, money, and other resources to obtain and maintain its valid, enforceable, and valuable WMC Marks. Runbuk paid €1 Million as part of the WMC Sales Agreement for the exclusive right to own and use the WMC brand, including the

18

WMC Registrations and WMC Common Law Mark in connection with its services, and has maintained the WMC Registered Marks ever since. Hu Dec. ¶¶ 7-8, Ex. 4.  Runbuk also puts considerable effort and resources into organizing and holding the WMC events and into maintaining the goodwill and reputation based on quality and unique nature of the WMC events. *Id*. ¶ 8. Defendants' unlawful activity is causing Runbuk to both runners and the consumer goodwill associated with their WMC brands.

By contrast, the hardship suffered by Defendants if an injunction issues is minimal. Again, to be clear, Runbuk does not seek to prevent Defendants from running their competing event. Defendants can still operate and earn revenue. What they cannot and should not be allowed to do is compete unfairly by using the WMC Marks to promote and reference that competing event.

**IV.     It is in the public interest to enjoin Defendants.**

It is in the public interest to prevent consumer confusion in the marketplace. *See La Potencia*, 733 F. Supp. 3d at 1276; *Popular Bank of Fla.*, 9 F. Supp. 2d at 1364; *Canes Bar & Grill of S. Fla., Inc. v. Sandbar Bay, LLC*, 343 F. Supp. 3d 1236, 1247 (S.D. Fla. 2018). And where there is a likelihood of success on the merits for trademark infringement, even where an injunction may possibly restrict competition, the balance weighs in favor of the injunction. *La Potencia*, 733 F. Supp. 3d at 1276.  To avoid another cycle of confusion—including amongst Miami marathon enthusiasts—the Court should issue the requested injunction.

**<u>CONCLUSION</u>**

Defendants are free to organize whatever races they want.  But they cannot ride the coattails of Runbuk's goodwill to do so. Defendants should be enjoined from using the WMC Marks (both registered and common law) pending trial in this case.

Dated: November 20, 2025

Respectfully submitted,

 /s/ James E. Gillenwater
James E. Gillenwater (SBN 1013518)
GREENBERG TRAURIG LLP
333 SE 2nd Avenue, Suite 4400
Miami, FL  33131
Tel: (305) 579-0767
gillenwaterj@gtlaw.com

David Bloch (*pro hac vice application pending*)
GREENBERG TRAURIG LLP
101 2nd St, San Francisco, CA 94105
Tel: (415) 655-1300
david.bloch@gtlaw.com

Barry Horwitz (*pro hac vice application pending*)
Kathere Cronin (*pro hac vice application pending*)
Michelle Kim (*pro hac vice application pending*)
GREENBERG TRAURIG LLP
360 N Green St, Chicago, IL 60607
Tel: (312) 456-8400
barry.horwitz@gtlaw.com
cronink@gtlaw.com
michelle.kim@gtlaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 20, 2025, the foregoing document was electronically filed with the Clerk of Court using CM/ECF, which will send a notice of electronic filing to counsel of record.

*/s/ James E. Gillenwater*

21