**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

RUNBUK, INC.,

     *Plaintiff*,                                   Case No. 25-cv-25413-FAM

v.

ICE CAP ADVENTURES LTD. and
DAVID KELLY,

     *Defendants.*

_____/

### DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Defendants, ICE CAP ADVENTURES LTD. ("Ice Cap") and David Kelly ("Mr. Kelly") (together "Defendants"), hereby file this Response in Opposition to Plaintiff RUNBUK, INC.'s ("Plaintiff") Motion for Preliminary Injunction and Incorporated Memorandum of Law ("Motion"), and allege as follows:

### I.      INTRODUCTION

Plaintiff is the organizer of the World Marathon Challenge ("WMC"), a race consisting of seven marathons on seven continents over one week. In this lawsuit, Plaintiff attempts to leverage trademark law to prevent Ice Cap from organizing its own similar race, claiming trademark rights in the descriptive phrase "7 MARATHONS 7 CONTINENTS 7 DAYS," and arguing Ice Cap therefore cannot use that phrase–or similar phrases–to describe its race. Ice Cap cannot promote or operate its own race if it is barred from describing it, and unfortunately for Plaintiff, the Supreme Court has prohibited the monopolization of descriptive phrases in this manner. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121–22 (2004).

Plaintiff further claims it has common law rights in another trademark, "777," but has not made the necessary allegations in its pleadings or evidentiary showings to substantiate such rights,

1

as further explained *infra*. Plaintiff's Motion should thus be denied because Plaintiff cannot meet the heavy burden to obtain the extraordinary remedy of a preliminary injunction.

In addition, the Motion must be denied as to the individual Mr. Kelly in its entirety because Plaintiff seeks to drag him into this Court without any grounds for personal jurisdiction over him.

## II.     BRIEF BACKGROUND FACTS

Plaintiff allegedly became involved with the WMC in 2016, an event during which participants run seven marathons on seven continents in seven days. (ECF 6, Ex. 1 at ¶ 2.) By that time, however, the concept of a "777 Challenge" and "7 marathons 7 continents 7 days" had existed since at least 2003, over a decade prior to Plaintiff's incorporation. Kelly's Aff. at ¶ 2-6, Exs. 1-6.

In 2016, Plaintiff attempted to register the marks "7 MARATHONS 7 CONTINENTS 7 DAYS", "7 MARATHONS 7 CONTINENTS 7 CONSECUTIVE DAYS", and "7 MARATHONS CLUB" in connection with the WMC. (ECF 6 at Exs. 2-4.); Exs. 6, 8 to Kelly's Aff. These marks were refused registration on the Principal Register due to their descriptive nature and were instead registered in the Supplemental Register. Exs. 7, 9 to Kelly's Aff. The mark "7 MARATHONS CLUB"[1] is the only mark registered on the Principal Register. (ECF 6 at Ex. 4.)

Ice Cap organizes a competing event known as The Great World Race ("TGWR"). Kelly's Aff. at ¶ 11. TGWR was inspired by a race done in 2003 by Ranulph Fiennes and Mike Stroud. *Id.* Ice Cap is organized in Ireland and owned by Mr. Kelly. *Id.* In connection with TGWR, Ice Cap registered the trademark "AROUND THE WORLD IN 7 DAYS", a term inspired by Jules Verne's "Around the World in Eighty Days." *Id.* at ¶ 12. Ice Cap also uses the phrases "7 marathons 7 continents 1 week" and "7 marathons on 7 continents" on its website and social media to describe

---

[1] Although Plaintiff mentions this trademark in their Complaint and Motion, Plaintiff fails to explain its relevancy, or how Defendants have allegedly infringed in this particular mark. Rather, Plaintiff's focus is on the trademarks registered on the Supplemental Register and on the dispute over "777."

TGWR. *Id.* at ¶ 20. Notably, all advertisement done for TGWR is done through an advertisement team hired by Ice Cap, and not by Mr. Kelly individually. *Id.*

Similarly, Ice Cap hires local personnel in each city to manage logistics and obtain the necessary permits. *Id.* ¶ 15-16. In Miami, Ice Cap hired Continental Event and Sports Management Group LLC. *Id.* at ¶ 16. Mr. Kelly individually never directly or for his own benefit made any contacts with Florida to organize the Miami race. *Id.* His only contact in Florida concerning TGWR was traveling to Miami to do a final review of the preparations done by independent contractors– an action he performs for every race location in his capacity as an Officer of Ice Cap, not in his individual capacity. *Id.* Mr. Kelly has had no other relevant contacts with Florida, aside from unrelated personal vacations. *Id.*

In September of 2024, Ice Cap, and not Mr. Kelly, applied for registration of the mark "777" for the services of "[o]rganizing, arranging, and conducting marathon, running, triathlon, duathlon, and athletic competition events." *Id.* at ¶ 26, Ex. 13. In October of 2024, Runbuk, for the first time since it was founded in 2016, decided to also apply for a trademark for "777." *Id.* at Ex. 14. This application was suspended due to Ice Cap's prior-filed application. *Id.* at Ex. 15. Runbuk has filed an opposition with the USTPO claiming that it, and not Ice Cap, has the right to this mark and as a result that Ice Cap's application for "777" should not register. *Id.* at ¶ 26. Notably, "777" was not one of the marks included in the purchase contract for WMC. (ECF 6, Ex. 5 at p. 5.)

### III.   LEGAL STANDARD FOR A PRELIMINARY INJUNCTION

A district court may grant injunctive relief if the movant shows the following: (1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."

*McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites. *Id.* (internal quotations omitted).

## IV.    LEGAL ARGUMENT

### A.    The Court Lacks Personal Jurisdiction Over Mr. Kelly and Therefore Cannot Enforce an Injunction Against Him.[2]

As more fully outlined in Defendants' Motion to Dismiss the Complaint, which Defendants incorporate herein by reference, neither general nor specific personal jurisdiction exist over Mr. Kelly. (ECF No. 23.) Mr. Kelly is an individual domiciled in Portugal, with sporadic contacts with this forum. Kelly's Aff. at ¶¶1, 18. Due Process precludes a finding of general personal jurisdiction over Mr. Kelly under these circumstances. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*, 582 U.S. 255, 262 (2017) (holding general personal jurisdiction over an individual is proper only in the forum where the individual resides).

Similarly, no specific personal jurisdiction exists either. While Plaintiff's Complaint and Motion improperly seek to drag Mr. Kelly in front of this Court by lumping him together with Ice Cap, a detailed review will reveal that there is not a single allegation in either filing as to how Mr. Kelly, allegedly individually and for his own personal benefit, engaged in any acts within this forum. Rather, all Plaintiff complains about is that Mr. Kelly created Ice Cap, which then set out to organize an event that competes with Plaintiff's venture. Throughout the Complaint, Plaintiff either lumps Mr. Kelly in with Ice Cap, complaining of acts by "Defendants"–in plural,–or wrongly states Mr. Kelly is acting in an individual capacity when really it is the entity Ice Cap,

---

[2] While Mr. Kelly is obligated to file the instant opposition to the injunction Motion by January 9, 2026, pursuant to this Honorable Court's Order, the filing of this response should by no means be construed as a waiver of the lack of personal jurisdiction argument on behalf of Mr. Kelly.

through third party contractors, that organizes and advertises TGWR. *See* Kelly's Aff. at ¶ 15- 20. Indeed, Mr. Kelly is not responsible for advertising TGWR, which is in the purview of an advertising team. *Id*. at ¶ 20. Further, the Complaint claims that Mr. Kelly applied for the "777" trademark when public records show that it was in fact Ice Cap that filed this application. (ECF 1 at ¶ 34.); Ex. 13 to Kelly's Aff.

Florida law is clear that an officer of a business is not subject to personal jurisdiction in Florida simply because of the business's minimum contacts. *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993). Rather, this Court has already explained Plaintiff must allege the specific acts that would constitute an intentional tort on the part of the officer and must allege that the officer individually, and not just the company, "adopted the mark or name that was the same or confusingly similar to Plaintiff's mark." *BFL Metal Prods v. RDFN Fum Nat. Braeden W. Pauls*, 24-cv-22267-BLOOM/Elfenbein, 2025 WL 958250 at *4-5 (S.D. Fla. Mar. 31, 2025) (citations omitted). Because no evidence was submitted by Plaintiff that even tends to suggest Mr. Kelly's individual and personal involvement in any of the allegations at issue in the Complaint and Motion, the Court cannot exercise specific personal jurisdiction over Mr. Kelly, and thus no injunction can be entered against him. *See e.g., Lathrop v. Unidentified, Wrecked & Abandoned Vessel*, 817 F. Supp 953, 961 (M.D. Fla. 1993).

**B.      Plaintiff Cannot Show a Substantial Likelihood of Success on The Merits.**

To prevail on a trademark infringement claim, a plaintiff must show that it has a mark distinctive enough to deserve protection under the Lanham Act, and defendant's use of it is likely to cause confusion. *See e.g., Custom Mfg. and Engineering, Inc. v. Midway Services, Inc.*, 508 F. 3d 641, 647 (11th Cir. 2007). As explained below, Plaintiff has not sufficiently demonstrated a substantial likelihood of success on the merits on either of these points.

   i.   *Plaintiff Has Not Shown It Has a Right in the "777" and "Around the World in 7 Days" Marks.*[3]

Plaintiff alleges a dispute over the "777" mark, claiming WMC has been known as the "777 Challenge" since 2015. (ECF 6, Ex. 1 at ¶ 2.) However, Plaintiff fails to provide any actual proof, other than Hu's conclusory and self-serving statements, that Plaintiff has indeed been using this mark continually since 2015. Similarly, Plaintiff's Complaint seeks to establish rights over the mark "AROUND THE WORLD IN 7 DAYS," but Plaintiff fails to provide any evidence or explanation of how it has used this mark or why it has any rights over it.

In any event, as Plaintiff has failed to obtain a federal registration for either of these marks, it can only rely on alleged common law trademark rights. In order to establish common law trademark rights, a Plaintiff must allege (1) it was the first to appropriate the mark by using it in a way that causes the relevant public to associate the mark with the user and (2) it continually used the mark since its appropriation. *Domond v. Peoplenetwork APS*, 748 F. App'x 261, 262-63 (11th Cir. 2018) (citation omitted); *Tally-Ho v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022–23 (11th Cir. 1989).

Plaintiff cannot meet this burden as the evidence on record is inapposite to Plaintiff's position. When Plaintiff purchased WMC in 2022, neither "777" nor "AROUND THE WORLD IN 7 DAYS" were listed as trademarks in the sales agreement. (ECF 6 at Ex. 5.) Further, Plaintiff waited nearly a decade since the inception of WMC to attempt to register the mark "777" and did so mark only *after* Ice Cap applied for registration of this mark in September of 2024. Kelly's Aff. ¶ 26. While Plaintiff did attach to Hu's Aff. its application for the mark "777" filed with the United States Patent and Trademark Office ("USPTO") in 2024, the alleged examples of use submitted

---

[3] While the Motion does not address the "Around The World in 7 Days" mark, Defendants address it here in an abundance of caution.

with that application are all from the years 2015-2018, a period during which Mr. Donovan was declared under oath that WMC did not consider "777" its mark. (D.E. 6 at Ex. 6.); Donovan Aff. at ¶¶3–5. It is therefore clear Plaintiff is not the owner of any trademark rights in these two marks because it was not the first to use it. *Domond*, 748 F. App'x at 262–63 (citation omitted).

ii.   *"7 Marathons 7 Continents 7 Days" and Variations Are Descriptive and Not Distinct.*

"Under the Lanham Act, federal trademark protection is available only to 'distinctive' marks—marks that serve the purpose of identifying the *source* of . . . goods or services." *Royal Palm Props., LLC v. Pink Palm Props., LLC*, 950 F.3d 776, 782 (11th Cir. 2020). There are only two ways in which a mark can be distinctive: (1) it can be inherently distinctive, or (2) it can acquire distinctiveness over time. *Id.*

The Eleventh Judicial Circuit has classified marks into four categories to help determine whether a mark is distinct at all, and if so, which category of distinct it falls under: (1) "fanciful" or "arbitrary," (2) "suggestive," (3) "descriptive," and (4) "generic."

> We consider fanciful marks (think "Verizon" telecommunications—the name is a made-up word), arbitrary marks (think "Apple" computers—the name is a real word that has nothing to do with the product) and suggestive marks (think "Igloo" coolers—the name is a real word that bears only an oblique relationship to the product) to be "inherently" distinctive. For marks in these categories, no proof of secondary meaning is necessary. By contrast, we consider descriptive marks (for example, an eyeglasses store called "Vision Center") and generic marks (a book-selling company called "Books") *not* to be inherently distinctive. Descriptive marks can become protectible only if they "acquire" distinctiveness by obtaining a "secondary meaning," and generic marks can never become protectible.

*Id.* at 783. (internal citations omitted).[4]

Florida courts follow two tests to differentiate between suggestive and descriptive marks: the imagination test and the third-party use test. *Trasco Wellness, LLC v. Tampa Bay Spine &*

---

[4] Plaintiff at no point in its Motion argues the marks at issue are either fanciful or arbitrary. Rather, Plaintiff discusses the validity of marks with secondary meaning. (D.E. 6 at p. 7.) Accordingly, Defendants will focus their analysis on whether the marks in question are suggestive, descriptive, or merely generic.

*Sport*, 8:23-cv-02536-WFJ-LSG, 2025 WL 2810659 at *8 (M.D. Fla. Oct. 2, 2025). The imagination test says that when "the customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination, the term cannot be considered a suggestive term." *Id.* at * 9 (citing Engineered Tax Services, Inc. v. Scarpello Consulting, Inc., 958 F. 3d 1323, 1329 (11th Cir. 2020).  The third-party use test instructs courts to look at "whether competitors would be likely to need the terms used in the trademark in describing their products." *Id.*

Plaintiff meets neither of these tests, and so the marks in question cannot be suggestive. The reason is simple–these marks literally describe what the event is: seven marathons, on seven continents, in seven days (or one week). Consumers do not need to use their imagination to perceive the nature of Plaintiff's services, thus Plaintiff's marks do not meet the imagination test. Likewise, Plaintiff's marks do not meet the third-party use test because there is no possible way that competitor can organize a race also involving seven marathons in seven continents in seven days without using the words or phrases in Plaintiff's proposed marks. *See e.g., Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*, 115 F. Supp.  2d 1361, 1367 (M.D. Fla. 2000) (finding the term "Battery Tender" was not entitled to protection as it was merely descriptive of the product provided, requiring no effort in the consumer's imagination to be understood as descriptive of a battery charger); *Trasco Wellness*, 2025 WL 2810659 at *11, 18 (finding the mark "Tampa Bay Spine & Sports Medicine" was merely descriptive of the services provided as it consisted of a "natural pairing of words" that described the services provided to customers without the need to use any imagination and competitors routinely used some combination of the words in the mark at issue). The marks at issue here are thus descriptive at best.

It is further highly probative that the USPTO has already rejected Plaintiff's applications of the marks "7 MARATHONS 7 CONTINENTS 7 DAYS" and "7 MARATHONS 7 CONTINENTS 7 CONSECUTIVE DAYS" on the grounds that these marks merely describe the services offered. Exs. 7, 9 to Kelly's Aff. The marks' descriptiveness is the precise reason why they are registered only on the Supplemental Register and do not enjoy a presumption of validity. *See e.g. Trasco*, 2025 WL 2810659 at *7. Plaintiff does not explain how the USPTO experts who reviewed these applications were wrong in finding these marks are purely descriptive.

Plaintiff's goal is clear and impermissible. Plaintiff wishes to obtain a monopoly over descriptive terms, a behavior that was admonished by the United States Supreme Court over two decades ago in *KP Permanent*, where the Court discussed "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first" and stated that the Lanham Act is not "meant to deprive commercial speakers of the ordinary utility of descriptive words." 543 U.S. at 122.

### iii. *Plaintiff's Descriptive Marks Have Not Acquired Secondary Meaning.*

Because "7 MARATHONS 7 CONTINENTS 7 DAYS" and "7 MARATHONS 7 CONTINENTS 7 CONSECUTIVE DAYS" are descriptive marks, Plaintiff has the burden of showing they have acquired secondary meaning, *i.e.*, distinctiveness, before it can succeed on a trademark infringement claim. *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011). "Secondary meaning is the connection in the consumer's mind between the mark and the provider of the service." *Investacorp, Inc. v. Arabian Inv. Banking Corp. E.C.*, 931 F.2d 1519, 1525 (11th Cir. 1991). The Eleventh Judicial Circuit has explained the question of whether a mark has acquired secondary meaning depends on four factors: (1) the length and nature of the name's use, (2) the nature and extent of advertising and promotion of the name, (3) the

9

efforts of the proprietor to promote a conscious connection between the name and the business, and (4) the degree of actual recognition by the public that the name designates the proprietor's product or service. *Knights*, 654 F.3d at 1188. None of these factors weigh in Plaintiff's favor.

First, even taking as true Plaintiff's statements that it has used these marks for years, this does not change the conclusion that the nature of the marks is *descriptive* of the event. Even long-term use does alone own transform a descriptive mark into a protectible one. *Id*. at 1188-89. As such, the nature of the use weighs in favor of Defendants and against Plaintiff.

As to the second and third of the *Knights* factors, Plaintiff's conclusory statement in Hu's Affidavit that "Runbuck has invested substantial marketing and promotional efforts concerning the WMC brand and WMC marks by advertising all over its social media accounts … and through its website … and WMC participants have used the WMC marks to raise funds for charitable cause…." does not paint the full picture for the required for analysis. 654 F.3d at 1188. This is so because "[f]or advertising and promotion, the question is not the extent of the promotional efforts, but their effectiveness in altering the meaning of the word to the consuming public." *La Potencia, LLC v. Chandler*, 733 F.Supp. 3d 1238, 1262 (S.D. Fla. 2024); *see also Vital Pharmaceuticals, Inc. v. Monster*, 553 F. 3d 1180, 1257 (S.D. Fla. 2021) (refusing to find secondary meaning where the movant had done "little to link its sales and advertising data to any concomitant effect on the consumer psyche"). Here, Plaintiff has not demonstrated the general public associates the descriptive phrase 7 marathons 7 continents 7 days, and variations thereto[5], solely with Plaintiff's event. Rather, the evidence shows the public uses the phrase to describe these types of events in general, be it the WMC or TGWR. This is the same conclusion reached by the USTPO examiners

---

[5] Plaintiff complains Defendants use phrases similar to its alleged marks, such as "7 marathons 7 continents 1 week". (ECF, Ex. 1 at ¶¶ 14, 15, Exs 9-10.)

who denied Plaintiff's applications. Exs. 7,9 to Kelly's Aff. Therefore, the third and fourth factors from *Knights* also weigh against Plaintiff.

Fourth and last, "the degree of actual recognition by the public that the name designates the proprietor's product or service", is particularly insightful. *Knights,* 654 F.3d at 1188. While Plaintiff believes that "widespread unsolicited media coverage establishes that the WMC Marks have acquired secondary meaning", this could not be farther from the truth. (ECF at p. 9.) Like the alleged third-party uses described above, the media outlets Plaintiff noted are simply describing the type of race, not establishing that consumers associate the marks exclusively with Plaintiff's race. This is supported by Ex. 17 to Hu's Aff (ECF, Ex. 18.), which shows news outlets like Boston 25 News posting an article titled "Mass. Man to run 7 marathons on 7 continents in 7 days."[6] Notably, news outlets use similar phrasing to also describe TGWR, with for example CNN posting an article titled "Putting grit and endurance to the test: 7 marathons, 7 continents in 7 days". Ex. 12 of Kelly's Aff. This is unavoidable; the media needs to describe the events for what they are, and trademark law cannot forbid this. Thus, Media coverage does the opposite of establishing the WMC marks have acquired secondary meaning;[7] it establishes the marks Plaintiff is seeking to enforce is nothing more than a compilation of descriptive terms used to define a specific event.

For similar reasons, the social media posts Plaintiff relied on in which the general public uses the phrase "7 marathons 7 continents 7 days" and variations thereof to describe their participation in TGWR (because that is exactly what TGWR consists of) weighs against Plaintiff.

---

[6] Other news articles cited by Defendants also include a YouTube video posted by Global News titled "7 marathons, 7 continents, 7 days: BC man sets out on the Great World Race for charity"; an article written on Global News' website titled "7 marathons, 7 continents, 7 days: Vancouver man sets out on the Great World Race for charity"; a broadcast by WLWT5 with the description "seven marathons in seven days in all seven continents" along with an article titled "Mason man runs seven marathons in seven days across seven continents"; and a CBC article titled "'Hardest thing I've ever done': Man runs 7 marathons in 7 days on 7 continents."

[7] Once again, Defendants point to the Court that two experts from the USPTO found the media's use of variations of the wording of Plaintiff's mark used to describe the type and number of events such as WMC and TGWR weigh against a finding of distinctiveness. Ex. 7, 9 of Kelly's Aff.

(ECF 11 at p. 4 (Instagram post stating "Go crush those 7 marathons in 7 continents in 7 days. We'll have a COLD plunge waiting for you at the finish line brother").) This, rather than proving any degree of recognition by the public, shows what Plaintiff claims as protectable marks are simply common phrases used by the public to describe these types of races. It follows that Plaintiff cannot possibly have a protectable interest over these phrases. *See Klayman v. Freedom's Watch, Inc.*, 765 F. Supp 2d. 1348, 1359 (S.D. Fla. 2008) (finding no protectable interest over a descriptive mark where the evidence did not suggest that the relevant public identified the descriptive mark with the plaintiff).

Because Plaintiff has not met its incredibly high and onerous burden to show the marks on the Supplemental Register are distinctive enough to be afforded protection, Plaintiff does not have a high likelihood of success on the merits and thus a preliminary injunction cannot be entered.

> ### iv.  *Plaintiff Has Not Shown a High Likelihood of Success in Proving Defendants' Use Is Likely to Cause Confusion.*

Even assuming, *arguendo*, that the mark "7 CONTINENTS 7 MARATHONS 7 DAYS" and its variations are distinctive enough to deserve protection, Plaintiff is still not likely to succeed on the merits because Plaintiff cannot show Defendants' use is likely to cause confusion.

In this Circuit, there are seven primary factors to consider in deciding whether there is a likelihood of confusion: (1) the type of mark at issue; (2) similarity of mark; (3) similarity of products or services; (4) identity of purchasers and similarity of retail outlets; (5) similarity of advertising campaigns; (6) the defendant's intent; and (7) actual confusion. *See e.g., Freedom Sac. And Loan Ass'n v. Way*, 757 F. 2d 1176, 1182 (11th Cir. 1985). The type of mark and evidence of actual confusion are the most important factors, and so Defendants will address them first. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935 (11th Cir. 2010).

> 1.  Actual Confusion

Actual confusion is proved through "reported instances of individuals who have actually become confused about the source of the services because of the similarities between the parties' trademarks." *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1360 (S.D. Fla. 1998). Instances of confusion include consumers asking about affiliation between the parties, attempts to purchase from one party what is actually offered by the other party, or misdirected correspondence such as bills or letters. *Id.*

However, the United States Supreme Court has explained a certain degree of confusion is tolerated when descriptive terms are used as a mark. *KP*, 543 U.S. at 121–22. In *KP*, the Court explained that both the common law and the Lanham Act tolerate "a certain degree of confusion on the part of consumers" when "an originally descriptive term was selected to be used as a mark" given "the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *Id.* If any confusion results, the Court explained, "that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *Id.*

Here, Plaintiff's examples of purported actual confusion come from Exs. 13-15, and 17-19 of Hu's Aff. Ex. 13 is a compilation of four (4) posts in which third parties, *not the consumers*, reposted, commented, or use the hashtag "#woldmarathonchallenge" on posts that referred to TGWR. (ECF 6 at Ex. 14.) Ex. 14 to Hu's Aff. is similarly composed of around seven posts or re-posts by third parties, while Ex. 15 contains one more repost by a third party. (*Id.* at Exs. 15, 16.) Eleven instances of confusion by random third parties–not even shown to be relevant consumers–in a span of nearly three years does not adequately support a finding of actual confusion. *See Sun Banks of Fla, Inc. v. Sun Federal Sav. and Loan Ass'n.*, 651 F. 3d 311, 319 (5th Cir. 1981) (holding

that less than fifteen incidents of confusion in three years, none coming from potential customers, was not sufficient indication of actual confusion).

Plaintiff also relies on Exs. 17 and 18 to Hu's Aff., a compilation of news articles from different sources that use headlines such as "Man runs 7 marathons in 7 days on 7 continents"; "Lebanese Olympian Chirine Njeim Conquers 7 Marathons on 7 Continents in 7 Days"; and "Becs Entry To Run Great World Race 7 Marathons, 7 Days, 7 Continents" to report on participants of TGWR. (ECF 6 at Exs. 18 and 19.) These descriptive phrases used by the media in connection with TGWR either have different phrasing or different punctuation. Remarkably, the USPTO's examiners concluded that news articles such as those Plaintiff presented did not prove secondary meaning given that the exact wording in the applicant's mark was not used and similar wording was used to describe services but not point to Plaintiff as the source. (ECF 6 at Exs. 8, 10.) In addition, none of these articles establish confusion on the part of *consumers*, which is the relevant question in analyzing the "actual confusion" prong. *Popular Bank*, 9 F. Supp. 2d at 1360; *see also Caliber*, 605 F.3d at 936 (holding this "circuit's caselaw makes plain that the consumers of the relevant product or service, especially the mark holder's costumers, turn the key" and "confusion of persons casually acquainting with a business carry little weight").

Critical in this case is the principle that sophisticated consumers are less likely to be confused. *FCOA v. Foremost Title*, 57 F. 4th 939, 957 (11th Cir. 2023). This case involves a highly sophisticated client base, one that can afford tens of thousands of dollars to sing up for an event and that is highly experienced in running marathons. Kelly's Aff. at ¶ 14. When sophisticated consumers are involved, confusion is less likely as these consumers have "special knowledge of the industry through education or experience" and "have invested significant time into becoming well-informed due to the nature of the purchase." *Id.*

14

Putting aside social media posts by non-consumers and media articles, and considering consumer sophistication, it is clear Plaintiff did not proffer sufficient evidence of actual confusion. Notably absent from Plaintiff's exhibits is evidence of confused purchasers, misrouted payments, mistaken registrations, or complaints from participants who believed they were signing up for Plaintiff's events instead of Ice Cap's or vice versa. The absence of evidence of this sort is beyond telling, evidencing Plaintiff has fallen awfully short of proving actual confusion.[8] Instead, all of Plaintiff's exhibits merely confirm Plaintiff is attempting to secure a monopoly over every day descriptive and non-distinct terms used to describe a specific type of event.

### 2.   Type of Mark

The more distinctive a plaintiff's mark is, the greater the likelihood that consumers will associate the registered mark and all similar marks with the registered owner." *Freedom Sac.*, 757 F. 2d at 1182. Because the distinctiveness of the mark is directly related to its category, suggestive and arbitrary marks are entitled to strong protection while descriptive marks, such as the ones at issue here, are much weaker. *See Deltona Transformer*, 115 F. Supp 2d at 1368. If a name is used by third parties other than the infringer, then it is less strongly protected than it would otherwise be. *Freedom Sac.*, 757 F. 2d at 1182.

Here, as explained above, the marks at issue are inherently weak: descriptive marks with no secondary meaning. As a result, variation of the phrases that make up the marks are routinely used by third parties, such as members of the media and the general public, to refer to events of a certain type, evidencing a lack of distinctiveness. This factor hence weighs against Plaintiff.

---

[8] Even assuming for arguments' sake that any actual confusion has been proven by Plaintiff, said confusion is the result of Plaintiff's decision to use descriptive words as its mark, a decision that Plaintiff cannot use to unreasonably censor speech. *KP*, 543 U.S. 111, 121-22.

15

### 3.   Similarity of the Mark

Plaintiff ignores many present distinctions. While Plaintiff uses the phrase "7 marathons 7 continents 7 days" to refer to its race, TGWR's website and banners use the phrase "7 marathons 7 continents in one week". (ECF 6 at Exs. 6 and 9.). TGWR's Instagram account says, "7 marathons on 7 continents." Aff. of Mr. Kelly at Ex. 10. The phrases are facially different, visually and phonetically. Further, the websites for TGWR and the WMC are different, the logos are different, and the races occur in different locations. *Id.* at ¶¶ 21–24. When the mark in question consists of a weakly protected phrase, even minor alterations can negate any confusing similarity between the two. *Freedom Sac.*, 757 F. 2d at 1182; *see also Welding Services*, 509 F. 3d at 1362 (holding dissimilarity between two logos "can defeat an infringement claim, even where the other six factors all weigh in favor of the plaintiff"). Given the inherent weakness of Plaintiff's marks, coupled with the obvious distinctions between Plaintiff's and Ice Cap's marks, this factor also weighs against Plaintiff.

### 4.   Similarity of the Services

It is not disputed both Plaintiff and Ice Cap organize a similar event: a race in which runners run seven marathons in seven different continents in seven days. However, as Plaintiff candidly recognizes in its Motion, trademark law does not prohibit Ice Cap from organizing such race and competing with Plaintiff. (ECF 6 at p. 4.)

### 5.   Identity of the Purchasers; Similarity of Retail Outlets; and Similarity of Advertising Campaigns

Defendants recognize the consumer base for the sort of event Plaintiff and Ice Cap organize is very niche: customers with the financial and physical ability to run seven marathons in seven different continents in only seven days. However, this is not the end of the inquiry. Rather, the

analysis requires there be some degree of overlap over where, how, and to whom the parties' products are sold. *Wrel, LLC v. Amazon.com., Inc.*, 28 F.4th 114, 135 (11th Cir. 2022).

Plaintiff's entire argument in support of the "how and where" is that Plaintiff and Ice Cap both advertise their events via their own websites and social media. This alone is insufficient to prove a likelihood to cause confusion. The Eleventh Judicial Circuit has explained that maintenance of websites "dispel[s] rather than cause confusion [] because the websites are separate and distinct, suggesting two completely unrelated business entities." *Tana v. Dantanna's*, 611 F. 3d 767, 778 (11th Cir. 2010). Moreover, TGWR further advertises at various marathon expos and in person meetings, setting it apart from the WMC. Kelly's Aff. At ¶ 20. Following the *Tana* precedent, in addition to the obvious differences between both websites reproduced in Ex. 11 of Kelly Aff., Plaintiff has not met its burden of demonstrating the similarity of retail outlets here, even if the client base is similar.

### 6.   Defendants' Intent

To assess ill intent, the court must ask "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1462 (S.D. Fla.), aff'd sub nom. *Caruso v. Estefan*, 166 F.3d 353 (11th Cir. 1998).

Here, Plaintiff's only claim in support of ill intent is that Defendants knew of WMC because Kelly served as its race doctor. (ECF at p. 17.) Yet, it is well-established that "prior knowledge…does not necessarily give rise to an inference of bad faith and may be consistent with good faith." *Id*. Defendants never intended to capitalize on Plaintiff's goodwill, the TGWR was inspired by Fiennes and Stroud's original race, not Plaintiff's event, and the mark "AROUND THE WORLD IN 7 DAYS" was inspired by novel Around the World in Eighty Days. Kelly's Aff.

17

at ¶ 11–12. Given Mr. Kelly's statements under oath,  and Plaintiff's failure to offer any evidence that Defendants adopted their marks to deceive consumers, Plaintiff again fails to meet the high burden for a preliminary injunction.

**C.      Plaintiff Has Not Shown Irreparable Harm.**

To show irreparable harm, Plaintiff must prove it will suffer an injury that cannot adequately compensated if it later on prevails on the merits. "The key word in this consideration is irreparable." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983). "Mere injuries…in terms of money, time and energy…are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date…weighs heavily against a claim of irreparable harm." *Id.*

In this case, TGWR was created in 2023, with races occurring since 2024, yet Plaintiff only now objects. Kelly's Aff. at ¶11. This delay "suggests that any threat of harm…has not… been significant enough to necessitate action." *Pinnacle*, 2019 WL 3890368, at *2. Even ignoring the delay, Plaintiff's claim there is irreparable harm because TGWM uses its own marks and organizes its own event is disingenuous. Trademark law cannot bar Ice Cap from organizing or describing a competing event, and Plaintiff knows this.

Plaintiff nonetheless brushes over these fatal issues by alleging that irreparable harm is presumed here because it has proven a substantial likelihood of success on the merits. (ECF at p. 17.) Plaintiff has not shown such success, which requires "a sufficiently strong showing of likelihood of confusion" before irreparable harm can be presumed. *McDonald's*, 147 F.3d at 1310. Given that no such showing has been made by Plaintiff, no irreparable harm should be presumed.

**D.      The Balance of Hardships Favors Defendants.**

Any harm to Plaintiff if the Court declines to issue the injunction is speculative at best. Plaintiff relies on a handful of social media posts and news articles that merely *describe* both events similarly. Defendants reemphasize that Plaintiff has not shown any lost business resulting from consumer confusion or any actual harm to its goodwill. At most, Plaintiff has shown similar descriptive terms are used to describe similar events, something entirely unsurprising.

By contrast, granting the requested injunction would do far more than protect Plaintiff's purported trademarks; it would impair Ice Cap's ability to describe TGWR altogether, thereby eliminating Defendants' business venture in its entirety, which business venture has cost the Defendants millions of dollars to create and organize for nearly three years. Kelly's Aff. at ¶ 19. Defendants simply cannot promote or operate this type of race without describing it.  Where, as here, the requested injunctive relief would effectively eliminate competition, courts in this circuit routinely find that the balance of hardships weighs in favor of defendants. *See e.g.*, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 703 F. Supp 2d 1307, 1316 (S.D. Fla. 2010) (finding the balance of hardship weighed in favor of defendant where the injunction requested would have damaged Defendants by hundreds of thousands of dollars, and the harm of which Plaintiff was complaining was merely "the harm of competition, to which [p]laintiff previously did not object"); *see also Pinnacle*, 2019 WL 3890368 at *3 (finding the balance of hardships weighed in favor of defendants when plaintiff presented no evidence of willful infringement and plaintiff had coexisted with defendant for five years).

**E.      The Public Interest Weights Against an Injunction.**

Plaintiff correctly notes that preventing consumer confusion can serve the public interest. (ECF at p. 19.); however, Plaintiff oversimplifies the analysis by ignoring other relevant considerations. In trademark infringement matters, the public interest factor requires courts to

consider "the public's interest in not being confused; the public's interest in encouraging, not stifling, competition; and the broader economic implications of the grant of the preliminary injunction." *Uber Promotions, Inc. v. Uber Techs., Inc.*, 162 F. Supp. 3d 1253, 1281 (N.D. Fla. 2016) (internal citations omitted).

Here, even assuming the public has some interest in avoiding confusion[9] between competing world-marathon events —which Defendants dispute —any speculative risk of confusion is outweighed by the strong public interest in encouraging, rather than stifling, competition. A free and competitive marketplace benefits consumers by fostering innovation and choice. Granting an injunction would allow Plaintiff to monopolize this business venture and limit consumer options. Hence, the public interest weighs against entering the injunction.

## V.    CONCLUSION

Plaintiff's Motion is an attempt to use trademark law to eliminate lawful competition by claiming ownership over descriptive concepts that the law does not protect, as well as baselessly claiming ownership over marks Plaintiff has never used simply because they could be descriptive of Plaintiff's event. Because Plaintiff has failed to establish personal jurisdiction, a likelihood of success on the merits, irreparable harm, or that the balance of equities and public interest favor injunctive relief, the Court should deny the Motion in full.

**WHEREFORE**, Defendants respectfully request this Honorable Court therefore deny Plaintiff's Motion and the request for a preliminary injunction, as well as any other relief as the Court deems just and proper.

---

[9] This confusion being "a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase." *KP*, 543 U.S. at, 121-22.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 9, 2026, a true and correct copy of the foregoing

was electronically filed with the Clerk of the Court via the CM/ECF system and furnished to all

counsel on the service list via automatically generated service email.

Dated: January 9, 2026

Respectfully submitted,

**AINSWORTH + CLANCY, PLLC**
1826 Ponce De Leon, Blvd.
Coral Gables, FL 33134
Telephone: (305) 600-3816
Facsimile: (305) 600-3817
*Counsel for Plaintiffs*

By: /s/ *Maria K. Casariego*
Maria K. Casariego, Esq.
Florida Bar No. 1058623
Email: maria@business-esq.com
Email: service1@business-esq.com

21